THE MIRVIS LAW FIRM, P.C.

December 21, 2024

**Via ECF**
The Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                **Re:** **United States v. Marat Lerner**
                     **Criminal Docket No.: 23-CR-00015 (NGG)**

Dear Judge Garaufis:

      Mr. Lerner respectfully submits this Sentencing Submission Letter in advance of his sentencing hearing, scheduled for January 7, 2025. Marat Lerner appears before this Court humbled by the gravity of his actions, bearing profound remorse for the harm he has caused, and demonstrating a resolute commitment to rehabilitation and restitution. This memorandum respectfully requests a sentence below the advisory Guidelines range, as dictated by the principles of 18 U.S.C. § 3553(a).

      This memorandum synthesizes compelling arguments based on Mr. Lerner's unique personal history, mitigating factors, documented rehabilitation efforts, and the exceptionally harsh pretrial detention conditions he endured at MDC Brooklyn. It incorporates heartfelt letters from family and community members, as well as authoritative precedent from the Second Circuit and beyond, to argue for a sentence that reflects justice tempered by mercy.

    **I.**     **THE 18 U.S.C. § 3553(A) FACTORS COMPEL A BELOW-GUIDELINE SENTENCE**

    **A. Nature and Circumstances of the Offense**

      Mr. Lerner has pled guilty to conspiracy to commit wire fraud and substantive wire fraud under 18 U.S.C. §§ 1349 and 1343. While the offense is serious, Mr. Lerner's role lacked criminal sophistication and arose from poor judgment during a period of financial instability.

      Courts have recognized that the advisory Guidelines often overemphasize loss amounts in white-collar cases, resulting in disproportionately harsh sentences. In *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), the court emphasized the importance of contextualizing loss-driven enhancements, cautioning against their undue influence on sentencing. Similarly, Mr. Lerner's case warrants a nuanced approach that considers his role and lack of malicious intent.

    **B. History and Characteristics of the Defendant**

    **1.**     **Family Responsibilities and Support**

28 DOOLEY STREET, 3RD FLOOR, BROOKLYN, NY 11235
PHONE: 718.934.4141 · FAX: 718.228.8408
MIRVIS.TONY@GMAIL.COM

Mr. Lerner is a devoted son, fiancé, and father figure whose absence has caused profound hardship for his family. Letters submitted to this Court detail his unwavering support for his ailing mother and his transformative role in the life of his fiancé's daughter, Emilia, who now calls him "dad".

The Second Circuit has recognized family hardship as a mitigating factor. In *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992), the court acknowledged the devastating impact incarceration can have on families and deemed such circumstances a valid basis for a downward variance.

2. **Charitable Contributions and Community Engagement**

Mr. Lerner's compassion extends beyond his family. He raised $45,000[1] for humanitarian relief efforts in Ukraine, ensuring critical supplies for families impacted by war. Rabbi Avrohom Winner, a leader in Brooklyn's Chabad community, describes Mr. Lerner as "a bright, thoughtful, and good-hearted person" whose absence is a loss to the community.

3. **Rehabilitation and Sobriety**

Since his incarceration, Mr. Lerner has achieved over 18 months of sobriety and actively pursued self-improvement. The Supreme Court in *Pepper v. United States*, 562 U.S. 476 (2011), underscored that post-offense rehabilitation efforts are critical in determining an appropriate sentence. Mr. Lerner's sobriety, coupled with his remorse, reflects his genuine commitment to change.

4. **Letters From Family and Friends**

**The Measure of a Man: Letters Reflecting Marat Lerner's True Character**

In determining the appropriate sentence for Marat Lerner, it is crucial to weigh not only the gravity of his transgressions but also the depth of his humanity, as revealed through heartfelt letters from his family, friends, neighbors, and community leaders. These testimonials provide a compelling narrative of a man whose positive impact extends far beyond the offense for which he now stands before this Court. (See Exhibit "A").

**A Lifelong Commitment to Family and Community**

Marat Lerner has been described by those closest to him as a loving son, devoted partner, and unwavering supporter of his community. His mother, Blima Shumyatsky, recalls her son's unwavering care during her battle with COVID-19, stating, "I do not think we would have survived

---

[1] *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), court affirming downward departure based on charitable fund-raising conduct as well as poor medical condition.

without his support." Even now, while detained, Marat continues to call and offer emotional support during her ongoing health challenges.

Viktoryia Nina Kabrera, his fiancé, illustrates the transformative role Marat has played in her and her young daughter's lives. She writes movingly of his efforts to step in as a father figure for her four-year-old daughter, Emilia, saying, "Emilia even started to call him 'dad,' and she misses him terribly." His genuine care extended to everyday acts of kindness, such as driving both to school and work, attending school events, and creating cherished moments like reading bedtime stories.

Neighbors Viktoria Sorkin and Anatoliy Kostak highlight his reliability and generosity, noting that during their family's battle with COVID-19, Marat selflessly ensured they had food and groceries. They describe him as a pillar of their community, always willing to assist with tasks large and small, from assembling furniture to shoveling snow for neighbors.

**A Life of Service and Redemption**

Rabbi Avrohom Winner, a leader in Brooklyn's Chabad Lubavitch community, attests to Marat's longstanding dedication to supporting Jewish immigrants and fostering cultural connection. He describes Marat as "a bright, thoughtful, and good-hearted person," emphasizing his contributions as a role model and advocate for community engagement. Rabbi Winner further notes that Marat has demonstrated profound remorse for his actions and expresses confidence in his capacity for positive change.

Additionally, several letters detail Marat's passion for humanitarian causes. His cousin, Regina Mirochnik, highlights his involvement in the Ukraine relief effort, where he worked tirelessly to bring joy to children affected by the war. She recounts how he provided toys and essential supplies, remarking that "Marat's presence in our lives has been a source of positivity and inspiration".

**The Capacity for Change and Redemption**

Marat's journey of self-reflection and commitment to rehabilitation is evident in the accounts of those who know him best. Viktoryia Nina Kabrera writes, "I observed his transformation from being a single man to a wonderful father and partner in just a year." This sentiment is echoed by others who have seen his willingness to address his shortcomings and grow from his mistakes.

The letters collectively portray a man whose misdeeds are an aberration in an otherwise constructive and compassionate life. They remind us that Marat's worth is not defined by the sum of his worst actions but by the myriad ways he has supported and uplifted those around him.

**A Plea for Mercy**

These testimonials underscore the devastating impact that prolonged incarceration would have not only on Marat but also on the countless individuals who depend on him. His absence has already left an emotional void in his family and community. As Rabbi Winner eloquently states, "Incarcerating Marat any longer would be a great and long-lasting loss, which its impact will take many years to amend."

In sentencing Marat Lerner, this Court has the opportunity to weigh his potential for rehabilitation against the harm already inflicted by his conduct. These letters are a testament to the belief that Mr. Lerner has the capacity to atone for his actions and continue to contribute meaningfully to his family and society.

## II. HARSH PRETRIAL DETENTION CONDITIONS WARRANT A DOWNWARD VARIANCE

Mr. Lerner's pretrial detention at the Metropolitan Detention Center (MDC) in Brooklyn has been marred by exceptionally harsh conditions that warrant consideration for additional credit toward his sentence[2]. Specifically, we request that the Court apply a 2-for-1 credit for the time served under these punitive circumstances, effectively reducing the overall sentence to reflect the severity of his incarceration at the MDC. There is no other way of saying it, the conditions at the MDC were so severe, a fair, just sentence requires additional sentence credit.

### A. Documented Adverse Conditions

- **Deprivation of Basic Needs**: Mr. Lerner endured multiple periods of 16–18 hours without access to water or functioning toilets.

- **Medical Neglect**: He was denied necessary medications for over three months, and repeated requests for medical and dental care were ignored.

- **Prolonged Solitary Confinement**: He was confined to his cell for 23 hours a day for extended periods, conditions known to exacerbate mental health challenges.

---

[2] Indeed, sentencing arguments based on the reportedly deplorable conditions at MDC have become so commonplace that—quite understandably—counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation. *See, e.g., United States v. Hernandez*, 23-CR-530 (GRB), DE 18 at 3 ("I will not belabor the horrific conditions of the MDC to this Court, as Your Honor is well aware of the national disgrace it has become."). *United States v. Colucci*, No. 23-CR-417 (GRB), 2024 U.S. Dist. LEXIS 138497, at *17 (E.D.N.Y. Aug. 5, 2024)

28 DOOLEY STREET, 3RD FLOOR, BROOKLYN, NY 11235
PHONE: 718.934.4141· FAX: 718.228.8408
MIRVIS.TONY@GMAIL.COM

### B. Precedent for Relief

Courts have consistently recognized that harsh pretrial conditions justify sentence reductions. In *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004), and *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), the courts acknowledged that punitive confinement warrants enhanced credit for time served.

### C. The Impact of MDC's Inhumane Conditions on Sentencing

Marat Lerner's pretrial detention at the Metropolitan Detention Center (MDC) in Brooklyn underscores the profound inhumanity and dysfunction of this facility, which federal courts have recognized as uniquely harsh and unsuitable for incarceration. Building on the reasoning articulated in *United States v. Colucci,* No. 23-CR-417 (GRB), 2024 U.S. Dist. LEXIS 138497, at *4-5 (E.D.N.Y. Aug. 5, 2024), where U.S. District Judge Gary R. Brown imposed a reduced sentence due to MDC's "dangerous, barbaric conditions," this Court should also consider MDC's notorious failings as a basis for leniency in sentencing Mr. Lerner.

### D. MDC's Conditions: A Basis for Downward Variance

The deplorable state of MDC has been highlighted in judicial decisions and corroborated by extensive anecdotal and systemic evidence. In *Colucci*, Judge Brown found that MDC's pervasive violence, lack of medical care, unsanitary conditions, and unlivable environment were so egregious as to justify converting a nine-month custodial sentence to home incarceration if the Bureau of Prisons (BOP) designated MDC as the facility for the defendant to serve his time.

The court documented horrifying incidents, including two killings, two stabbings, and a severe beating over a five-month period, alongside systemic issues such as malfunctioning panic buttons, forced inmate-provided medical care, and allegations of staff corruption. Judge Brown concluded that these conditions constituted "meaningfully harsher" incarceration than at other federal facilities, warranting significant consideration during sentencing.

Similarly, Mr. Lerner's experience at MDC has exposed him to punitive and inhumane treatment that far exceeds the ordinary hardships of incarceration. Over multiple occasions, he was denied access to water or functioning toilets for extended periods, deprived of essential medications and visits with doctors for months, and subjected to prolonged lockdowns of 23 hours per day for up to 90 days. These conditions are not merely harsh but amount to cruel and unusual punishment.

**Precedent Supporting Leniency Based on MDC's Conditions**

Courts in this Circuit and beyond have consistently recognized the impact of punitive detention conditions on sentencing. As Judge Brown noted in *Colucci*, MDC's reputation for

28 DOOLEY STREET, 3RD FLOOR, BROOKLYN, NY 11235
PHONE: 718.934.4141 · FAX: 718.228.8408
MIRVIS.TONY@GMAIL.COM

barbarity is so entrenched within the bench and bar of the Second Circuit that defense counsel routinely cite it as a basis for leniency, often without factual dispute from government prosecutors.

The reasoning in *Colucci* aligns with longstanding precedent recognizing the relevance of detention conditions to sentencing outcomes:

- In *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004), the court reduced a defendant's sentence based on pretrial confinement conditions, finding them "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case."
- In *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), the Second Circuit emphasized that harsh pre-sentence confinement can serve as a mitigating factor during sentencing.

The broader jurisprudence reinforces that when detention conditions exacerbate the punitive nature of incarceration beyond what is anticipated or acceptable, they justify a downward variance. When the conditions of a jail amount to torture, a variance is not only justified, it is required.

1. **The Parsimony Principle and Individualized Sentencing**

The parsimony principle codified in 18 U.S.C. § 3553(a) requires that any sentence imposed be "sufficient, but not greater than necessary" to achieve the goals of sentencing. Acknowledging the exceptionally harsh conditions at MDC, a facility known for systemic failures and inhumane treatment, this Court should grant Mr. Lerner credit for the time he has served in these punitive conditions, treating each day as double time served.

Moreover, Judge Brown's analysis in *Colucci* serves as a clear example of how judicial discretion can and should be exercised to ensure proportionality in sentencing. Even if the offense warrants incarceration, subjecting a defendant to the extraordinary hardships of MDC contravenes the principles of proportional punishment and humane treatment.

2. **Broader Policy Considerations: A Humanitarian Approach to Sentencing**

In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court reiterated that sentencing must consider the defendant's personal history, characteristics, and the conditions they have endured. Mr. Lerner's experience at MDC underscores his resilience but also highlights the urgent need for this Court to temper punishment with compassion.

The systemic failures at MDC not only amplify the punitive impact of pretrial detention but also undermine public confidence in the fairness and humanity of the criminal justice system. By accounting for these conditions in Mr. Lerner's sentence, this Court can reaffirm its commitment to justice that is not blind to systemic inequities.

Mr. Lerner's experience at MDC reflects the harsh reality of a facility that has been repeatedly condemned by courts for its dangerous and inhumane conditions. Following the

rationale in *Colucci* and other precedents, this Court should consider these conditions as a significant mitigating factor, applying a downward variance to Mr. Lerner's sentence. Such an approach not only aligns with the legal and moral principles underlying sentencing but also ensures that Mr. Lerner's punishment remains proportional and humane.

### 3. Adjustment for Harsh Pretrial Detention Conditions at MDC Brooklyn

Mr. Lerner's pretrial detention at the Metropolitan Detention Center (MDC) in Brooklyn has been marked by exceptionally harsh conditions that warrant consideration for additional credit toward his sentence. Specifically, we request that the Court apply a 2-for-1 credit for the time served under these punitive circumstances, effectively reducing the overall sentence to reflect the severity of his confinement experience.

### 4. Documented Adverse Conditions:

a) **Extended Deprivation of Basic Sanitation:**

- On multiple occasions—November 26, 28, 29, and 30, 2024—Mr. Lerner endured periods ranging from 16 to 18 hours without access to water or functioning toilets. Such conditions are not only inhumane but also pose significant health risks.

b) **Denial of Necessary Medical Care:**

- Upon his initial incarceration, Mr. Lerner was deprived of his prescribed medications for over three months.

- Repeated requests for medical and dental attention went unaddressed, exacerbating his health issues and causing unnecessary suffering.

c) **Prolonged Solitary Confinement:**

- Mr. Lerner was subjected to lockdowns confining him to his cell for 23 hours a day over periods extending from 30 to 90 days. Such isolation has well-documented detrimental effects on mental health and is considered a severe form of punishment.

- In *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525, 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024), the court held that prisoners were regularly subject to 24-hour lockdowns and related deprivations, it has become "routine for judges in both District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."

d) **Legal Precedents Supporting Sentence Reduction:**

The Second Circuit has acknowledged that unusually harsh pretrial detention conditions can justify a downward departure in sentencing. In *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004), the court granted a reduction due to the defendant's exposure to harsh conditions, including extended lockdowns and inadequate medical care, during pretrial detention. The court emphasized that such conditions are "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case."

Similarly, in *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), the court recognized that pre-sentence confinement conditions might warrant a downward departure, particularly when they are excessively harsh. The court noted that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."

In *United States v. Chavez*, 2024 U.S. Dist. LEXIS 1525, 2024 WL 50233, at *6, Judge Furman ordered that a narcotics defendant subject to a multi-year sentence remain at liberty pending surrender, based largely on the conditions at MDC.

Judge Komitee granted a motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release. *Cf. United States v. Santana*, No. 22 CR. 368 (VM), 2024 U.S. Dist. LEXIS 90220, 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods.").

In *United States v. Nunez*, 2024 U.S. Dist. LEXIS 187985, at *16-18 (S.D.N.Y. Oct. 16, 2024), the Court held that the "sentence imposed in this matter took into account the uniquely harsh conditions Nunez experienced at MDC prior to sentencing, conditions which included perpetual lockdowns, inadequate medical care, and staggering violence that "ma[de] time spent there essentially the equivalent of either time and a half or two times what would ordinarily be served." Sent'g Tr. at 20:8-11. The Court was not aware, and thus did not consider, that Nunez would return to MDC after sentencing to serve out the remainder of his term of confinement. And, indeed, the conditions Nunez faced in MDC after his sentencing were unusually harsh. Nunez reports that, in April 2024, "there were reports of maggots or weevils found in the food being served to inmates." Supp. Mot. at 4. Multiple MDC inmates were murdered at the facility in the summer of 2024. *Id.* at 4-5 (citing news reports). The conditions inside MDC have worsened to such a degree that the BOP has recently ceased designating prisoners to serve their sentences at MDC altogether.

Courts in this Circuit have repeatedly recognized that the harsh conditions at the area's jails counsel in favor of a shorter overall sentence. *See, e.g.*, Sent'g Tr., *Gonzalez*, 18 Cr. 669, ECF No. 250 at 17:18-18:5; *see also United States v. Lopez*, No. 16 Cr. 317, 2024 U.S. Dist. LEXIS 38493, 2024 WL 964593, at *5 (S.D.N.Y. Mar. 5, 2024) (finding that "the lockdowns and associated rigors experienced by" the defendant "qualify, under the catch-all provision of this guidance, as an extraordinary and compelling reason justifying a sentence reduction"). This factor, therefore, also weighs in favor of a sentence reduction."

In *United States v. Ray Par.*, 2024 U.S. Dist. LEXIS 151228, at *14 (S.D.N.Y. Aug. 22, 2024), the court held that the "conditions at the area's jails make time spent there "essentially the equivalent of either time and a half or two times what would ordinarily be served." *Gonzalez*, 18 Cr. 669, ECF No. 250 at 17:18-18:3. Such time is "materially different than [time] served at a jail or prison elsewhere in the United States."

**The *Colucci* Decision**

The Court in *Colucci* described the conditions at MDC as truly terrifying. The Court held:

*"Unchecked Violence" at MDC*

Chaos reigns, along with uncontrolled violence. *Griffin*, 2024 U.S. Dist. LEXIS 102127, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC). Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility. This review is necessarily limited, as the Court's access to relevant information was exceptionally narrow. In other words, there were, most certainly, other incidents not collected during this Court's review. Nevertheless, the results are staggering.

Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as-yet-unidentified "brawls." A summary of the available facts underlying each of these events follows:

**March 2024** - Defendant 2 was awaiting sentencing for conviction on a single firearms possession count. According to sealed filings by Defendant 2, his attorney and the United States Probation Department, Defendant 2 reports being stabbed repeatedly at MDC in March 2024, sustaining wounds to both arms, his abdomen and one knee. The defendant reports receiving no medical care, but instead was simply locked in a cell in the Secure Housing Unit (SHU) for 25

days. His attorney, an assistant federal defender, advised that the defendant had been attacked while resisting a robbery in the facility by gang members.

**April 2024** - According to information and photographs filed by the United States Attorney in a criminal prosecution, three members of the MS-13 housed at the MDC attacked a fourth inmate with improvised knives, inflicting 44 stab wounds on his back, chest, abdomen, right arm and leg. *United States v. Rivas*, 18-CR-398(RPK), DE 363. The entire, brutal attack was captured on video. *Id.* That video, filed by the Government and recently made public, displays the lengthy, horrific assault, committed by inmates under no apparent supervision. Reports suggest that the leader of the attack, serving 35 years for a near decapitation in an internecine gang dispute, is also serving time for stabbing a rival gang member in an NYC jail. "Unchecked Violence," *New York Daily News*, July 28, 2024. Viewing the security video footage reveals many things: the three inmates perpetrated this organized, armed attack in an open area unimpeded by any supervision, the response to the event took an unconscionably long time, and the victim, suffering from 44 knife wounds, was left unaided while a few outnumbered corrections officers eventually attempted to pursue the attackers.

**May 2024 -** Christian Griffin had served about five weeks of a 90-day sentence at MDC for shoplifting while on supervised release. *Griffin*, 2024 U.S. Dist. LEXIS 102127, 2024 WL 2891686 at *1. On May 15, he advised a corrections officer on his unit of a belief that he was in danger, requesting transfer to another unit. *Id.* No such action was taken. The next day, three inmates physically assaulted and severely beat Griffin, leaving him with "a fracture of the right orbital bone—a broken eye socket, in layman's terms—as well as a laceration to his right eye and swelling and bruising of the eye and face." He was treated at a hospital, where doctors advised that he required an ophthalmological consult and possible follow-up surgery. While his face remained swollen and painful for weeks thereafter, MDC failed to provide any appropriate medical care. *Id.*

**June 2024 -** Extensive media reports indicate that on June 7, 2024, an inmate named Uriel Whyte was fatally stabbed in the neck in a dispute over drugs within the confines of the facility. In a letter to my colleague, Judge Azrack, who presided over Whyte's prosecution, the Government confirmed only that Mr. Whyte had "passed away." *United States v. Whyte*, 21-CR-390(JMA), DE 52. The death of Mr. Whyte appears to be subject of an ongoing investigation, yet there seems to be little doubt that Mr. Whyte was slain while at MDC.

**July 2024 –** About six weeks after the Whyte killing, on July 17, 2024, the Court was advised of a lockdown of the facility based upon a "grave security situation." Subsequent reports revealed that this situation was, in fact, the apparent killing of another inmate during a physical altercation among prisoners housed at MDC. *See, e.g.*, Fadulu, L., "Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail," *The New York Times*, July 17, 2024. For days afterwards, the BOP website reflected that the facility remained on lockdown, as the site read "All visiting at this facility

has been suspended until further notice." This presumably arose from the second fatal attack upon an inmate at the facility in the space of six weeks.

Mr. Lerner was an inmate at the MDC for all of the above referenced dates.

**Request for Relief:**

In light of the egregious conditions Mr. Lerner has endured—conditions that surpass typical detention hardships—we respectfully request that the Court apply a 2-for-1 credit for the time served under these punitive circumstances. This adjustment would align with precedents set by the Second Circuit and appropriately reflect the undue suffering experienced during his pretrial detention.

Such an adjustment would not only serve the interests of justice but also acknowledge the fundamental principle that punishment should be proportionate and humane.

### III. THE GUIDELINES OVERSTATE THE SERIOUSNESS OF THE OFFENSE

The Guidelines in this case recommend a sentence disproportionately harsh for the offense, driven largely by loss calculations that fail to capture Mr. Lerner's individual culpability. In *United States v. Musgrave*, 647 F. App'x 529 (6th Cir. 2016), the court noted that rigid adherence to such calculations often leads to sentences that are unduly severe and fail to serve the interests of justice.

The fraud guidelines, criticized for their lack of empirical foundation, place excessive weight on monetary loss without considering mitigating factors like role, intent, or capacity for restitution.

### A VARIANCE IS APPROPRIATE

A variance is warranted under 18 U.S.C. § 3553(a), which mandates a sentence "sufficient, but not greater than necessary" to achieve the goals of sentencing. The limitations of the Guidelines are glaring, especially in white-collar cases, where their rigid reliance on loss calculations often fails to account for the individual characteristics of the defendant and the nuanced context of the crime.

#### I. The Guidelines' Heavy Emphasis on Loss Amount Distorts Proportionality

The fraud Guidelines, rooted in U.S.S.G. § 2B1.1, place undue weight on loss amount, resulting in advisory ranges that frequently exaggerate the gravity of a defendant's conduct. Courts across the country have expressed concerns about the mechanical application of these Guidelines in white-collar cases:

- **United States v. Gupta**, 904 F. Supp. 2d 349 (S.D.N.Y. 2012): Judge Rakoff emphasized that the fraud Guidelines are "a black stain" on sentencing fairness, driven more by political influence than by empirical evidence or fairness considerations. Loss-driven enhancements often fail to differentiate between perpetrators of varying culpability.

- **United States v. Parris**, 573 F. Supp. 2d 744 (E.D.N.Y. 2008): The court observed that the fraud Guidelines yield "irrational" and "harsh" results in many cases, disproportionately punishing individuals with no prior criminal record for their financial missteps.

In Mr. Lerner's case, the advisory Guidelines fail to account for mitigating factors. Factors such as his high level of success in obtaining mortgage modifications for many of his clients. Mr. Lerner cannot make his victims whole from a jail cell. However, he is willing to abide by a condition, wherein 50% of his income while he is on supervised release would go towards restitution and making his victims whole. Yet another mitigating factor is the absence of criminal sophistication. He used one bank account for his business and to pay for his personal expenses. Such simplicity has made the Government's investigatory duties much easier and less time-consuming. While financial loss occurred, these numbers alone do not capture his intent, remorse, or the broader context of his actions. Mr. Lerner's letter to Your Honor succinctly states Mr. Lerner's remorse and his desire to fix everything he broke for his victims. (Exhibit 'B").

## II.     Lack of Empirical Basis Undermines the Guidelines' Authority

The Guidelines' lack of empirical foundation has been a recurring critique. The Sentencing Commission, under Congressional directives, adopted enhancements that were never based on data-driven analysis.

- **Kimbrough v. United States**, 552 U.S. 85 (2007): The Supreme Court highlighted that courts may vary from Guidelines unsupported by empirical research, such as those for drug or fraud offenses.

- **United States v. Beiermann**, 599 F. Supp. 2d 1087 (N.D. Iowa 2009): The court rejected Guidelines inflated by Congressional mandates, finding that they failed to align with sentencing purposes under § 3553(a).

Similarly, the fraud enhancements applied in Mr. Lerner's case rely on a simplistic formula that multiplies loss amounts without regard for individual culpability or the offense's actual impact. Courts should reject such enhancements as inconsistent with the Sentencing Commission's institutional role.

## III.     Harsh Sentences Undermine Rehabilitation and Deterrence

Excessive sentences do not necessarily deter crime or promote respect for the law; instead, they can lead to outcomes that are counterproductive.



- **United States v. Bannister**, 786 F. Supp. 2d 617 (E.D.N.Y. 2011): The court noted that "long sentences can breed disrespect for the system" and exacerbate social harm by undermining rehabilitation.

- **Eric Holder's ABA Speech (2013)**: The former Attorney General criticized the trend of "draconian" sentences, asserting that they often serve no good law enforcement purpose and disproportionately burden individuals for minor infractions.

Mr. Lerner has already demonstrated significant rehabilitation, achieving 18 months of sobriety while on pretrial release as well as after he was remanded. The conditions at the MDC opened his eyes and there is no way that he would allow himself to be separated from his loving family and placed in what can only be described as hell on earth. Mr. Lerner's incarceration period at the MDC has been substantial enough to assure the Court that he will not recidivate. Whereas, a reduced sentence, substantially below the Guidelines would enable him to continue making meaningful contributions to society, consistent with § 3553(a)'s rehabilitative goals.

### IV. Alternative Sentences Sufficiently Achieve Sentencing Goals

Sentencing must prioritize proportionality and focus on justice for both the offense and the offender. Alternative forms of punishment—such as probation, community service, or home confinement—can serve as effective deterrents without imposing unnecessary hardship.

- **United States v. Gall**, 552 U.S. 38 (2007): The Court upheld a probationary sentence, emphasizing that alternative sentences can be "substantial punishments" and sufficient to achieve sentencing goals.

- **United States v. Mateo**, 299 F. Supp. 2d 201 (S.D.N.Y. 2004): Highlighted the role of creative sentencing in cases where the Guidelines disproportionately punish defendants with mitigating circumstances.

Mr. Lerner is a strong candidate for alternative sentencing due to his sincere remorse, his commitment to restitution, and the disproportionate impact a lengthy incarceration would have on his family. A sentence of time served, plus one year of home confinement, plus a five-year term of supervised release with a condition that 50% of his earnings would go towards restitution and making his victims whole. While punishment is a just desert for his conduct, he has served 15.5 months or 466 days as of the date of sentencing at one of the most dangerous jails in the United States. Where he suffered through conditions so terrible that it is beyond comprehension how human beings treat each other with such disdain. Mr. Lerner is not a risk to recidivate and keeping him in jail for a Guideline sentence would do more harm than good. It costs the Government money to house and feed Mr. Lerner. That responsibility can be transferred to Mr. Lerner's family while he serves a term of home confinement. Agreeing to forfeit 50% of his income for a term of five years is also a substantial punishment that will keep him from recidivating and will also be a punishment that is substantial to stop others from committing similar types of crimes. Most importantly, the victims would receive restitutio much sooner, likely when they really need it as opposed to several years from now if Mr. Lerner serves a Guideline sentence.

The advisory Sentencing Guidelines, while providing a framework, must yield to the statutory directive that sentences reflect individualized assessments of the offender and the offense. The rigid application of the fraud Guidelines in Mr. Lerner's case would lead to a sentence far greater than necessary to achieve the purposes of sentencing under § 3553(a).

For these reasons, Mr. Lerner respectfully requests this Court impose a significantly below-Guideline sentence that prioritizes proportionality, rehabilitation, and justice.

### IV. A SENTENCE "SUFFICIENT, BUT NOT GREATER THAN NECESSARY"

A sentence below the advisory Guidelines range is warranted for Mr. Marat Lerner under 18 U.S.C. § 3553(a), which mandates that a sentence be "sufficient, but not greater than necessary" to achieve the purposes of sentencing. Courts have consistently held that this statutory directive supersedes the mechanical application of the Guidelines, requiring individualized sentencing that accounts for the unique circumstances of each defendant.

Mr. Lerner's profound remorse, genuine rehabilitation efforts, significant familial obligations, and the disproportionately harsh conditions of his pretrial detention all point toward a sentence below the Guidelines as both appropriate and just.

### I. THE PRINCIPLE OF PARSIMONY IN SENTENCING

The parsimony principle requires courts to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing: retribution, deterrence, incapacitation, and rehabilitation.

- **Kimbrough v. United States**, 552 U.S. 85 (2007): The Supreme Court affirmed the importance of judicial discretion in sentencing, emphasizing that rigid adherence to the Guidelines is not required when they produce a result greater than necessary to satisfy § 3553(a).

- **United States v. Cavera**, 550 F.3d 180 (2d Cir. 2008) (en banc): The Second Circuit underscored that the Guidelines are advisory, not mandatory, and courts must evaluate the unique characteristics of each case to impose an appropriate sentence.

Here, Mr. Lerner's personal circumstances, the mitigating factors of his offense, and the extraordinary hardships he endured during pretrial detention justify a sentence significantly below the Guidelines range.

### II. MITIGATING FACTORS SUPPORTING A BELOW-GUIDELINE SENTENCE

### A. Genuine Remorse and Acceptance of Responsibility

Mr. Lerner's heartfelt letter to the Court expresses deep remorse for his actions and their impact on his victims. His willingness to plead guilty early and take responsibility demonstrates his genuine contrition. Acceptance of responsibility is a critical factor in sentencing, often leading courts to impose reduced sentences.

- **Gall v. United States**, 552 U.S. 38 (2007): The Supreme Court held that post-offense conduct, including acceptance of responsibility, is a valid basis for sentencing variances.

- **United States v. Douglas**, 713 F.3d 694 (2d Cir. 2013): The court emphasized that genuine remorse is a mitigating factor in determining a fair sentence.

### B. Rehabilitation Efforts

Since the date of his arrest, while on pretrial release and then while in custody of the MDC, Mr. Lerner achieved over 18 months of sobriety and took significant steps toward rehabilitation. His actions align with the rehabilitative goals of sentencing under § 3553(a).

- **Pepper v. United States**, 562 U.S. 476 (2011): The Supreme Court emphasized the importance of post-offense rehabilitation in determining an individualized sentence.

- **United States v. Maier**, 975 F.2d 944 (2d Cir. 1992): Highlighted the significance of rehabilitation in crafting an appropriate sentence.

### B. Family Obligations

Mr. Lerner's role as a caregiver to his ailing mother and his position as a father figure to his partner's young daughter present compelling grounds for leniency. Incarceration would impose a disproportionate burden on his family, a factor courts have repeatedly recognized.

- **United States v. Johnson**, 964 F.2d 124 (2d Cir. 1992): The Second Circuit found that extraordinary family responsibilities can justify a downward variance.

- **United States v. Alba**, 933 F.2d 1117 (2d Cir. 1991): Held that sentencing should consider the impact on dependents when the defendant is a primary caregiver.

28 DOOLEY STREET, 3RD FLOOR, BROOKLYN, NY 11235
PHONE: 718.934.4141 · FAX: 718.228.8408
MIRVIS.TONY@GMAIL.COM

### C. Harsh Pretrial Detention

Mr. Lerner's pretrial detention at MDC Brooklyn exposed him to conditions so severe as to warrant additional consideration. Multiple courts have held that excessively harsh pretrial conditions can justify downward variances.

- **United States v. Mateo**, 299 F. Supp. 2d 201 (S.D.N.Y. 2004): The court reduced the defendant's sentence due to the "qualitatively more severe" nature of pretrial detention conditions.

- **United States v. Carty**, 264 F.3d 191 (2d Cir. 2001): Emphasized that pre-sentence confinement conditions can serve as a mitigating factor.

## II. THE GUIDELINES OVERSTATE THE SERIOUSNESS OF THE OFFENSE

As outlined in prior sections, the fraud Guidelines disproportionately emphasize financial loss while failing to adequately account for mitigating factors such as intent, role, and personal circumstances. Courts have repeatedly criticized the mechanical application of these Guidelines.

- **United States v. Parris**, 573 F. Supp. 2d 744 (E.D.N.Y. 2008): The court noted that the fraud Guidelines often result in "irrational and draconian" sentences that overstate the seriousness of the offense.

- **United States v. Algahaim**, 842 F.3d 796 (2d Cir. 2016): Held that loss-based enhancements can distort sentencing fairness, especially in cases involving non-violent, first-time offenders.

## III. PROPORTIONALITY AND THE NEED FOR ALTERNATIVE SENTENCING

A below-Guideline sentence would better serve the goals of sentencing while avoiding the disproportionate harm caused by unnecessary incarceration.

- **United States v. Gall**, 552 U.S. 38 (2007): The Court upheld a probationary sentence, recognizing that alternative sentences can satisfy sentencing goals while mitigating harm to the defendant and society.

- **United States v. Bannister**, 786 F. Supp. 2d 617 (E.D.N.Y. 2011): The court observed that lengthy sentences often undermine rehabilitation and community reintegration.

IV. **CONCLUSION**

Mr. Lerner's profound remorse, demonstrated rehabilitation, and the extraordinary hardships of his pretrial detention underscore that a below-Guideline sentence is both sufficient and just. Such a sentence would reflect the principles of proportionality, rehabilitation, and individualized justice that are central to federal sentencing. A sentence below the guidelines acknowledges both the gravity of the offense and the enduring potential for redemption. A below-Guideline sentence is not only warranted but necessary to fulfill the mandate of 18 U.S.C. § 3553(a).

**Respectfully submitted,**

By: /S/ *Tony Mirvis*
Tony Mirvis, Esq.
*Counsel for Marat Lerner*

cc: AUSA Axelrod &Ngai